# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW MEXICO

In re:   STUART RYAN JARAMILLO                                              Case No. 13-11090

Debtor.

## MEMORANDUM OPINION

Before the Court is the motion to dismiss Debtor Stuart Jaramillo's Chapter 7 case for abuse filed by the United States Trustee (the "UST"). *See* Docket No. 19.  The UST asserts the presumption of abuse arises under 11 U.S.C. § 707(b)(2) (the "means test") and the totality of the circumstances of Mr. Jaramillo's financial situation demonstrates abuse under 11 U.S.C. § 707(b)(3).  The Court held a trial on the issue of abuse, which concluded on October 16, 2014.  After carefully considering the evidence and arguments, the Court concludes the Chapter 7 case must be dismissed under § 707(b)(3).

FINDINGS OF FACT

Mr. Jaramillo is a life insurance salesman for the New York Life Insurance Company of America ("New York Life").  His wife, Monique Jaramillo, also sells insurance for New York Life.  The Jaramillos have two minor children together, and Mr. Jaramillo has two adult children (ages 24 and 27) from a previous relationship.

Mr. Jaramillo began his insurance career with New York Life, working there from 1987 through 2003.  During much of that time he worked in Texas.  In 2003, he was recruited by Guardian Life Insurance Company ("Guardian") to establish a new office in Albuquerque, New Mexico.  The Jaramillos moved from Texas to Albuquerque, and Mrs. Jaramillo also began working with Guardian.  Guardian provided Mr. Jaramillo with a certain amount of guaranteed compensation for the first two years.  However, he worked as an independent contractor and was

required to pay all operating costs from the commissions his office collected. If the commissions were insufficient to cover operating costs in any given month, Guardian loaned Mr. Jaramillo the difference with the expectation that he would repay the loan when the office became more profitable.

When Mr. Jaramillo moved to Albuquerque, he believed he would be establishing a Guardian office in an underserved market. Unbeknownst to him, there was another Guardian office nearby. As a result, Mr. Jaramillo's office did not earn sufficient commissions to cover operating costs. Between 2003 and 2010, Mr. Jaramillo received several hundred thousand dollars in loans from Guardian in connection with establishing the new office. When Mr. Jaramillo asked about his growing debt, Guardian encouraged him to "keep building." In December 2010, Mr. Jaramillo became frustrated with the situation and resigned. Mrs. Jaramillo resigned shortly thereafter, and in early 2011 the couple returned to selling insurance for New York Life.

In the two years that followed, Guardian attempted to recoup a portion of its loans to Mr. Jaramillo through "general agent overrides," meaning that Guardian retained any commissions due to Mr. Jaramillo from previous sales. Guardian retained at least $50,000 to $60,000 worth of commissions due to Mr. Jaramillo. In December 2012, Guardian filed suit in New York to recover the remaining amount owed on the loans, which totaled about $650,000. Guardian offered to settle the dispute if Mr. Jaramillo agreed to pay about $7,000 per month for about eight years, which he asserts he could not afford. After consulting with counsel regarding the cost of litigation and the likelihood of prevailing, Mr. Jaramillo elected not to defend the lawsuit.

Mr. Jaramillo filed a voluntary petition under Chapter 7 of the Bankruptcy Code on March 31, 2013 (the "Petition Date"). Schedules D and F show about $1 million of secured debt

and about $760,000 of unsecured debt. Most of the unsecured debt represents the claim of Guardian, which precipitated commencement of the Chapter 7 case. Mr. Jaramillo projects that he will have negative monthly income of about $1,877.[1] The UST disagrees and contends Mr. Jaramillo has disposable income available each month.

Mr. Jaramillo lives an upscale lifestyle by local standards, which prior to 2013, was commensurate with his income and debts. Although the Jaramillos' income briefly dropped after switching life insurance companies in 2011, they typically make over $200,000 per year. The Jaramillos' adjusted gross income was approximately $202,000 in 2012, approximately $173,000 in 2013, and over $200,000 in the 14 months following the Petition Date. *See* Exhibits T-4 through T-10. When Mr. Jaramillo returned to New York Life in 2011, the company agreed to pay him a certain amount of "PEA" (or guaranteed) income for three years in addition to his earned commissions. For the three year period ending in April 2014, Mr. Jaramillo received $107,702 of PEA income, which averages about $35,900 per year. *See* Exhibits T-4 through T-8. The purpose of the PEA agreement was to supplement Mr. Jaramillo's commissions while he established a client base while working with New York Life. Just like at Guardian, Mr. Jaramillo pays all operating costs including rent, insurance, phone, internet, etc. in connection with his office at New York Life. The PEA agreement expired in March or April of 2014. The evidence at trial showed that his commissions had been increasing over time since 2011, which offset his need for the PEA income. Going forward, it appears that the Jaramillo's projected gross income will be about $240,000 per year.[2]

---

[1] That amount differs from his original and amended Schedule J, which each projected negative monthly income of over $4,500. Mr. Jaramillo adjusted those amounts in Tables 2 and 3 attached to his post-trial brief. *See* Docket No. 48.

[2] The Court calculated that amount by multiplying Mr. Jaramillo's monthly "projected future gross income," which he provided in Table 2 to his post-trial brief, by 12. *See* Docket No. 48-2.

3

Mr. Jaramillo's largest expenditures are his mortgage payments and his life insurance premiums. The Jaramillos reside in a 5,000 square foot house with five bedrooms and five bathrooms. They purchased the house in 2003. In 2007 - just before the recession - the house appraised for over $1,000,000. At that time the Jaramillos obtained a second mortgage and made a number of improvements to the house. Today, Mr. Jaramillo estimates the house is worth about $750,000 and is under-secured by at least $200,000. Bank of America holds a first mortgage on the house in the principal amount of about $750,000. First Financial Bank holds a second mortgage in the principal amount of about $230,000. The monthly mortgage payments and accompanying monthly expenses on the house total about $6,925, broken down as follows: (1) first mortgage: $3,516; (2) second mortgage: $1,000; (3) electricity: $1,155; (4) water and sewer: $149; (5) maintenance: $290; (6) real estate taxes: $505; and (7) insurance: $310. The mortgage payments typically consist entirely of interest. *See* Amended Schedule J (Exhibit T-3). When the Jaramillos are able to do so, they make small principal payments on the mortgages ranging from about $19 to $68 per month.

Although the Jaramillos occasionally entertain clients at the house, they maintain separate offices where they conduct the majority of their business. They live in the house with their two minor sons. Mr. Jaramillo's 24 year old daughter and 27 year old son also occasionally reside there for brief periods. The adult children resided in the house in late 2012 and part of 2013, but they moved out around October 2013.

In addition to making the house payments, Mr. Jaramillo devotes a substantial portion of his income to life insurance premiums. The Jaramillos pay about $5,897 in life insurance premiums per month. Of that amount, anywhere between $154 and about $920[3] is attributable to

---

[3] The evidence regarding the term component of the life insurance premiums conflicts to some extent. Exhibit X - which reflects the life insurance policies the Jaramillos owned prepetition and post-petition -

4

"term" life insurance, and the rest is attributable to "whole" life insurance. Term life insurance policies remain in force for a specified number of years, while whole life insurance policies, absent a default, remain in force for the insured's entire lifetime and accumulate a cash value. Mr. Jaramillo has policies issued by New York Life which provide for $1 million in whole life coverage and $2 million in term life coverage. Mrs. Jaramillo has similar policies which provide for close to $1 million in whole life coverage and about $1 million in term coverage.[4] The Jaramillos previously had more extensive life insurance coverage with Guardian, but they surrendered the Guardian policies after the Petition Date, partly to save money and partly because of the lawsuit.

The whole life insurance policies serve three purposes: (1) to provide for the Jaramillos' children if they pass away; (2) to save for retirement; and (3) as a cushion against their inconsistent income. Mr. Jaramillo is not in excellent health, and the Jaramillos do not have a traditional retirement fund. They may borrow money against the cash value of the whole life policies without incurring a penalty. The Jaramillos often borrow money against the cash value of the whole life policies to pay bills and cover operating expenses during months where they earn lower commissions. In some months, they even borrow money from the whole life policies

---

shows that the Jaramillos pay about $154 per month in term life insurance premiums. Exhibit S-3, which was used as a demonstrative exhibit in connection with closing argument, shows that Mr. Jaramillo agreed to take a deduction of $160 for term life insurance premium payments on his adjusted Form B22. However, when the Court compares Exhibit T-11 (which is a handwritten summary of life insurance policies prepared by Mrs. Jaramillo) with Exhibit X, it appears that the Jaramillos pay about $920 in term life insurance premiums per month. In any event, the exact amount of the term life insurance premiums is not dispositive here.

[4] Based on the evidence presented at trial, the exact amount of Mrs. Jaramillo's coverage is not clear. She previously had $1,350,000 in whole life coverage and $1 million in term coverage. Mr. Jaramillo testified that she now has close to $2 million in total coverage. After considering other testimony and the way in which the couple's policies have historically been structured, the Court infers that Mrs. Jaramillo has about $1 million in term coverage, and the remainder is whole life coverage. As with the term component of the premiums, the exact breakdown of Mrs. Jaramillo's coverage is not dispositive.

5

to pay their life insurance premiums. The cash value of the whole life policies has decreased during the pendency of Mr. Jaramillo's bankruptcy case.

Beyond life insurance premiums and mortgage payments, the UST asserts a number of Mr. Jaramillo's other expenses are excessive.[5] Mr. Jaramillo occasionally helps his adult family members. Each month he gives his elderly father $200 (typically as a gift card to Walmart), gives his adult daughter about $200, and pays about $300 in co-payments for his adult son's prescriptions. The adult children both have health problems. Mr. Jaramillo made payments on his adult son's student loans in the amount of about $370 per month prior to the bankruptcy case. He made those payments because he co-signed on the student loans, but he ceased making them after the Petition Date. Mr. Jaramillo also scheduled $642.80 per month in personal and family travel and about $112 per month in payments for vehicle registrations and boat storage.

The Jaramillos also pay about $982 per month in private parochial school tuition for their two younger sons. The Jaramillos' sons are gifted, and Mrs. Jaramillo has spent a good deal of time and effort ensuring that they receive a good education. Their youngest son is in the sixth grade. He is doing well in his parochial school and only wishes to remain there through the eighth grade. After that he will attend public high school. The Jaramillos' older boy is finishing the eighth grade. He originally planned to go to a private high school next year but is now going to public school.

The Jaramillos have made other efforts to cut expenses since the Petition Date. They surrendered two Lexus vehicles and a camper-trailer. The Jaramillos also retain landscape workers and housekeeping services less frequently and instead perform much of the maintenance

---

[5] Except as otherwise addressed in the discussion section, the Court is making no determination as to whether the payment of such additional expenses demonstrates abuse in this case.

on their own. Mr. Jaramillo stopped paying his older son's student loan payments and has provided less financial help to his adult children since the Petition Date.

Mr. Jaramillo is not eligible for Chapter 13 relief because of the amount of his unsecured debt. The UST wants him to convert to Chapter 11. During closing argument, the UST suggested that if Mr. Jaramillo proposed a reasonable plan but could not obtain confirmation, it might not resist any motion to re-convert the case back to Chapter 7.

## DISCUSSION

The UST asserts that granting Chapter 7 relief to Mr. Jaramillo would be an abuse of the provisions of that chapter. According to the UST, Mr. Jaramillo fails the "means test" under § 707(b)(2), and his case should be dismissed under the "totality of the circumstances" test contained in § 707(b)(3). Because the Court finds that § 707(b)(3) requires dismissal of Mr. Jaramillo's Chapter 7 case, it need not address whether he also fails the means test under § 707(b)(2).

### I. Dismissal Under § 707(b)(3): The Totality Test

Pursuant to 11 U.S.C. § 707(b)(1) and (3), the Court may dismiss a Chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if "the totality of the circumstances … of the debtor's financial situation demonstrates abuse."[6] If the Court finds

---

[6] That section provides, in relevant part:
    (b)(1) After notice and a hearing, the court … may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter....
        (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(I) of such paragraph does not arise or is rebutted, the court shall consider—
            (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.
11 U.S.C. § 707(b)(1), (3).

7

abuse, the case can also be converted to Chapter 11 or Chapter 13 (if the debtor is eligible for Chapter 13 relief) with the debtor's consent. 11 U.S.C. § 707(b)(1).

The current version of § 707(b)(3) was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *See McDow v. Dudley,* 662 F.3d 284, 288 (4th Cir. 2011) (noting that "Congress added the current version of § 707(b) to the Bankruptcy Code with its enactment of the" BAPCPA).[7] The pre-BAPCPA language of § 707(b) did not incorporate the "totality of the circumstances" test and instead provided for dismissal upon a finding of "substantial abuse." *Id*. ("The prior version of § 707(b) required a showing of 'substantial abuse' to justify dismissal of a Chapter 7 case…. The BAPCPA, however, repealed the 'substantial' qualifier of 'abuse.'").[8]

The Bankruptcy Code does not define when the "totality of the circumstances" requires dismissal. Prior to the enactment of the BAPCPA, the Tenth Circuit used a totality of the circumstances test to interpret the term "substantial abuse." *See In re Stewart*, 175 F.3d 796 (10th Cir. 1999) (setting forth what are commonly referred to as the "*Stewart* Factors" in considering whether the totality of the circumstances demonstrates substantial abuse). Today, courts generally agree that because Congress added the phrase "totality of the circumstances" to the BAPCPA, the pre-BAPCPA cases using that test are still applicable to the analysis of "abuse" under § 707(b)(3). *See In re Witcher,* 702 F.3d 619 (11th Cir. 2012) (suggesting that "Congress was doubtless aware" of the relevant pre-BAPCPA jurisprudence "when it codified

---

[7] *See also In re Witcher,* 702 F.3d 619, 622 (11th Cir. 2012) (observing that the phrase "totality of the circumstances" was incorporated into § 707(b)(3) through the BAPCPA).
[8] *See also In re Rudler,* 576 F.3d 37, 40 (1st Cir. 2009) ("As amended by the BAPCA, section 707(b) drops the qualifying word 'substantial,' permitting a bankruptcy court to dismiss a Chapter 7 proceeding brought by an individual debtor who has mostly consumer debts if the court finds that the granting of relief would be an abuse.") (internal quotations omitted).

8

the totality-of-the-circumstances standard").[9] The Court will therefore continue to apply the *Stewart* Factors to determine whether a Chapter 7 case should be dismissed under § 707(b)(3).

A debtor's ability to pay is the primary factor in determining whether granting Chapter 7 relief would amount to an abuse under the "totality of the circumstances" test. *In re Stewart*, 175 F.3d 796, 809 (10th Cir.1999). Other relevant factors include: "(1) whether the debtor enjoys a stable source of future income; (2) whether the debtor is eligible for adjustment of debt through Chapter 13; (3) whether state remedies exist to ease the financial predicament; (4) the degree of relief obtainable through private negotiation;" (5) "sudden illness, calamity, disability, or unemployment;" (6) whether the debtor's expenses are excessive and/or can be significantly reduced without being deprived of adequate food, clothing, shelter, and other necessities; (7) the accuracy of the statements and schedules; (8) the existence of excessive cash advances or consumer purchases; and (9) the debtor's good faith. *Id.* (internal quotations omitted).

In this case, several factors weigh in favor of Mr. Jaramillo. He is not eligible for Chapter 13 relief; however, he is a good candidate for Chapter 11 relief. Private negotiation has been unsuccessful; Guardian simply offered to allow him to pay the amount claimed in full at a rate of about $7,000 per month over eight years. There is no evidence of extravagant consumer spending or cash advances. Occasionally helping an elderly parent or adult child in poor health

---

[9] *See also In re Mondragon,* 2007 WL 2461616, *1 (Bankr.D.N.M. 2007) (concluding that the *Stewart* Factors should still be applied in considering whether a case should be dismissed under the totality of the circumstances test); *In re Ziegler,* 2009 WL 5943249, *2 (Bankr.D.Colo. 2009) (applying the *Stewart* Factors to determine whether debtors' case must be dismissed under § 707(b)(3)); *In re Vogeler,* 393 B.R. 240, 242 (Bankr.D.Kan. 2008) (same); *In re Wake,* 2007 WL 2670113, *2 (Bankr.E.D.Okla. 2007) (same). *Cf. In re Colgate*, 370 B.R. 50, 56 (Bankr.E.D.N.Y. 2007) ("While the standard for finding cause to dismiss a debtor's chapter 7 case has been lowered post-BAPCPA, courts still apply" pre-BAPCPA factors "when deciding motions under § 707(b)(3)."); *In re de Pellegrini*, 365 B.R. 830, 832 (Bankr.S.D.Ohio 2007) (finding that pre-BAPCPA cases are still instructive under § 707(b)(3)); *In re Pfiefer,* 365 B.R. 187, 191 (Bankr.D.Mont. 2007) ("Because Congress retained the phrase 'totality of the circumstances' in BAPCPA, the Court concludes that it may look to pre-BAPCPA case law to construe the meaning of that phrase under § 707(b)(3).").

does not amount to abuse, nor does allowing a minor child to finish middle school in parochial school. Although the Jaramillos are certainly better situated than most Chapter 7 debtors, the Court found them to be honest and has determined that they invoked the bankruptcy process in good faith.

With that said, after considering the factors addressing ability to pay and to reduce expenses without sacrificing necessities - which are inextricably linked in this case - the Court cannot justify granting Mr. Jaramillo a Chapter 7 discharge. The Jaramillos' income varies each month because it is commission-based, but they consistently make over $200,000 per year. This would normally be enough to pay a meaningful dividend to unsecured creditors. Instead, the Jaramillos project their disposable income will be negative $1,877 per month going forward. Two large monthly expenses explain this deficiency: the Jaramillos pay $6,925 in housing expenses and $5,897 in life insurance payments, for a total of $12,822 per month. The Court will address these two expenses in turn.[10]

*A. The House*

Mr. Jaramillos' monthly mortgage payments total $4,516.54,[11] which is about 3.5 times the IRS' suggested standards for a family of four and over 3 times the standards for a family of five.[12] Under the IRS standard, the monthly housing and utility payment is $1,296 for a family for four and $1,317 for a family of five or more.

---

[10] Other factors the Court has not specifically addressed are neutral.
[11] The monthly housing expenses total $6,925 when including electricity ($1,155), water and sewer ($149), maintenance ($290), real estate taxes ($505), and insurance ($310) in addition to the mortgage payments.
[12] The UST asserts the Court should use a household size of four for purposes of determining abuse under the totality of the circumstances test because the older children do not generally live at home. Mr. Jaramillo asserts the Court should use a household size of five. In this case, whether the Court uses a four or five person household size does not change the result under the totality of the circumstances test.

10

Courts are generally skeptical of granting Chapter 7 discharges to debtors with expensive houses, provided their debts are primarily consumer debts. *See, e.g., In re Ramsay,* 440 B.R. 85, 97 (Bankr.M.D.Pa. 2010) (finding that the debtor had the ability to pay unsecured creditors because he did not need a house worth $500,000, which in the court's view was "excessive and unreasonable").[13] According to some courts, substantially exceeding the IRS' suggested housing standards is enough to demonstrate abuse. *See, e.g., In re Pandl*, 407 B.R. 299 (Bankr. S.D.Ohio 2009) (finding abuse where debtor was paying 1.75 times the IRS' suggested standards for a house with no equity).

In this Court's view, there is no mechanical standard for determining whether a mortgage payment is too high for purposes of § 707(b)(3). *See, e.g., In re Moutousis,* 418 B.R. 703 (E.D.Mich. 2009) (reversing bankruptcy court's dismissal for abuse where the only thing considered was the fact that debtor's mortgage payments were three times the IRS standard). It is more appropriate to consider the individual debtor's circumstances, including whether requiring the debtor to give up the house would yield a material dividend to unsecured creditors, the number of dependents living at home, whether the debtor has other unreasonable expenses, and the circumstances leading up to the bankruptcy filing. *See, e.g., In re McKay,* 463 B.R 915 (Bankr.S.D.Ga. 2010) (finding no abuse where debtor had an expensive house that, if sold, would not yield a meaningful dividend to unsecured creditors). *Cf. In re Gearhart,* 2010 WL

---

[13] *See also In re Gearhart,* 2010 WL 4866179 (Bankr.M.D.Pa. 2010) (concluding that allowing the debtor to retain a residence worth $345,000, with monthly payments of $3695, was unreasonable and excessive); *In re Hilmes,* 438 B.R. 897 (N.D.Tex. 2010) (expressing skepticism over the bankruptcy court's finding of no substantial abuse where Chapter 7 debtor sought to keep a $500,000 house); *In re Hoffman,* 413 B.R. 191, 197 (Bankr.M.D.Pa. 2008) (concluding that the debtor's "current monthly housing expense of $2,338.00 is excessive"); *In re Mooney*, 313 BR 709,714-715 (Bankr.N.D.Ohio 2004) ("If the mortgage payment on that home is so large that a debtor falls behind in payments to other creditors, eventually seeking to discharge most of these debts in Chapter 7 while still keeping the house, this would be a substantial abuse of the provisions of Chapter 7"); *Shaw v U.S. Bankruptcy Administrator*, 310 BR 538 (M.D.N.C. 2004) (finding mortgage payments of $3,349 per month to retain a house appraised at $415,000 excessive and unreasonable).

11

4866179 (Bankr.M.D.Pa. 2010) (considering factors such as whether debtors could afford the home when they purchased it, the number of dependents, whether they had other lavish items, and whether they liquidated other assets in an attempt to pay debts).

Here, Mr. Jaramillo's total house payment, including taxes, maintenance, and insurance, exceeds $6,900. The house is under-secured by at least $200,000, and he is primarily making interest-only payments. The Jaramillos generally live in the house with their two younger sons. Mr. Jaramillo asserts that he needs a nice house to entertain clients and maintain his business. The Court disagrees. Except to entertain clients, Mr. Jaramillo does not work out of his home. He maintains separate New York Life offices in town and can entertain clients at other venues. The Court is convinced that downsizing to a smaller, less expensive house could contribute toward paying a significant dividend to unsecured creditors in a Chapter 11 case.

Finally, and importantly, Mr. Jaramillo's house payment is not the only substantial expense he can reasonably reduce. The Court need not determine whether the house payments alone are enough to demonstrate abuse in a Chapter 7 case because, as discussed below, the life insurance premiums are excessive.[14]

*B. The Life Insurance Premiums*

Mr. Jaramillo's monthly life insurance premiums of $5,897 are excessive for at least three reasons. First, the Court is not convinced the Jaramillos need $5 million in life insurance coverage, including almost $2 million in whole life coverage, to provide for their family. The Jaramillos both work and have relatively healthy incomes. Mr. Jaramillo's older children are in

---

[14] The Court is making no determination at this time as to whether Mr. Jaramillo can retain the house if he ultimately elects to convert his case to Chapter 11. If his estimate regarding the value of the house is accurate, he could potentially propose a plan that strips off the fully unsecured second mortgage and cures and reinstates the first mortgage. *See* 11 U.S.C. §§ 506; 1123. That issue presently is on appeal before the United States Supreme Court. *See Bank of America, N.A. v. Toledo-Cardona (In re Toledo–Cardona, 556),* 556 Fed.Appx. 911 (11th Cir. 2014), *cert. granted* --- U.S. --- 135 S.Ct. 677 (2014).

their twenties and have had the opportunity attend college. It appears that the Jaramillos' younger sons likely will attend and graduate from college within about 10 years.

Second, to the extent the Jaramillos are using the whole life policies as investment vehicles for retirement, the Court finds that their retirement contributions are excessive. The whole life policies account for between $4,977 and $5,743 of the total monthly premium.[15] The Court need not adopt any particular test for analyzing the reasonableness of retirement savings to conclude that contributing about $5,000 per month to a retirement vehicle while obtaining a Chapter 7 discharge is unreasonable. *See In re Hilmes,* 438 B.R. 897 (N.D.Tex. 2010) (collecting cases and discussing how different courts analyze voluntary retirement contributions under the Post-BAPCPA "totality of the circumstances" test); *In re MacNamara,* 2009 WL 1606985, *5 (Bankr.M.D.Pa. 2009) (finding that payment of $543.96 monthly whole life insurance premium was unreasonable for purposes of § 707(b)(3)).

Finally, unsecured creditors could realize a substantial dividend if Mr. Jaramillo reduces his life insurance coverage to a more reasonable amount and downsizes to a less expensive house, thereby significantly reducing the $5,897 monthly premium payments and $6,925 monthly housing expenses. A reduction in those expenses could generate thousands of dollars per month in disposable income. Notwithstanding Mr. Jaramillo's arguments to the contrary, the Court is convinced he has the ability to pay a meaningful amount to creditors under a Chapter 11 plan. Chapter 11 should allow him the flexibility to propose a plan that accounts for the monthly income variations he experiences.

After weighing the relevant *Stewart* Factors, the Court concludes that allowing Mr. Jaramillo to receive a Chapter 7 discharge while paying over $12,822 in expenses relating to

---

[15] The Court calculated that amount by subtracting the estimated amount of monthly term premiums (between $154 and $920) from the total amount of monthly premiums ($5,897).

housing and life insurance would be an abuse under § 707(b)(3). Having based its decision primarily on Mr. Jaramillo's ability to pay in light of the two excessive expenses described above, the Court need not reach his argument regarding the time period to be used in evaluating disposable income after the Petition Date or the UST's arguments regarding other allegedly excessive expenses.

Despite its ruling, the Court is not unsympathetic to Mr. Jaramillo's circumstances. The lawsuit by Guardian had a deleterious impact on Mr. Jaramillo and his family, and the Court believes he is an "honest but unfortunate debtor." *U.S. v. Hale,* 762 F.3d 1214, 1221 (10th Cir. 2014) ("[T]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor.") (internal quotations omitted). If Mr. Jaramillo converts to Chapter 11 and proposes a plan that would be confirmed except for his failure to satisfy the absolute priority rule, the Court will be receptive to Mr. Jaramillo re-converting to Chapter 7. In that case, Mr. Jaramillo will have done all that could reasonably be expected of him to repay his creditors, and he should not be denied bankruptcy relief altogether.

## CONCLUSION

Based on Mr. Jaramillo's excessive payments for life insurance premiums and housing, as weighed against the other *Stewart* Factors to be considered under the "totality of the circumstances" test, the Court finds that granting Mr. Jaramillo a Chapter 7 discharge would be an abuse of the provisions of that chapter. Unless Mr. Jaramillo files an appropriate motion to convert his Chapter 7 case to Chapter 11 on or before **March 31, 2015**, the Court will dismiss his Chapter 7 case. The Court will enter a separate order consistent with this memorandum opinion.

/s/ Robert H. Jacobvitz
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Entered on: March 10, 2015

COPY TO:

Daniel J Behles
Attorney for the Debtor
3800 Osuna Rd NE, STE #2
Albuquerque, NM 87109

Leonard K Martinez-Metzgar
Attorney for the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608

15

Case 13-11090-j7    Doc 60    Filed 03/10/15    Entered 03/10/15 14:37:00 Page 15 of 15